JEREMIAH CRONIN, Trustee, Etc., *vs.* SAM'L WATKINS.

April Term, 1873.

DEMURRER—EFFECT OF OVERRULING.—The court may, on final hearing, reverse its rulings upon an overruled demurrer; and if the order overruling the demurrer give the defendant leave to rely upon its matters "in his answer," it will be construed to mean "on final hearing," and the defendant may insist upon them, although he has not relied upon them in his answer.

LEGAL SUIT IN EQUITY.—A bill by a trustee on the naked legal title, without joining the beneficiary, is a legal suit, which will not be entertained in equity if it appear that the enforcement of the legal right would be inequitable between the defendant and beneficiary.

LEASE—COVENANT—ASSIGNS.—If a covenant in a lease concern a thing not *in esse* at the demise, but to be built thereafter, and assigns be not expressly mentioned, the covenant does not run with the land, and its benefit will not pass to the assignee of the lessee.

LEASE—ASSIGNMENT.—The assignment of the lessee's interest and rights in the lease carries to the assignee the personal covenant of the lessor with the lessee, but this is a chose in action not embraced in our registration laws, and the assignment thereof is not complete until actual notice to the debtor, and a previous settlement with the lessee would be good.

SAME—CASE IN JUDGMENT.—A lease provided that improvements made by the lessee during the term might be removed, or sold to the lessor upon valuation,

and they were valued at the expiration of the lease and the valuation paid to the lessee by the lessor, without notice of a previous assignment of the lease by the lessee to the complainant for the benefit of the lessee's wife. *Held*, that a bill by the complainant for the value of the improvements, filed more than a year after the expiration of the lease, could not be maintained.

*Baxter Smith*, for complainant.
*Thos. H. Malone*, for defendant.

THE CHANCELLOR :—On the 10th of February, 1864, by instrument of writing, signed and executed in duplicate by Samuel Watkins and John Currin, the former leased to the latter for a term of five years from the 10th of February, 1864, a vacant lot on College street, in Nashville, at an annual rent of $225. This lease concludes with this provision: "And it is understood that at the expiration of this lease John Currin shall have the right to remove any building he may have put upon this lot, or, if he should prefer to sell, and we cannot agree, then three competent freeholders, citizens of Nashville, shall value the improvements, and it will be binding on both parties." This instrument was never registered, but was attested by two witnesses.

John Currin did put improvements upon the lot, and continued to pay the rents until the expiration of the term of lease. He did not remove the building erected by him, but the value thereof was estimated to his satisfaction, after the termination of the lease, at $1,275, and the amount of this valuation was paid to him by Watkins on the 1st of March, 1869, for which he gave a receipt on the same day as follows :

"For value received, I hereby transfer and assign to Sam'l Watkins all right and interest in a house that I built on his property on College street, for the sum of twelve hundred and seventy-five dollars, the receipt of which is hereby acknowledged." Signed by Currin and attested by one witness.

John Currin resided with his wife in the house which he had erected on the leased lot, during the lease, and until some time after the sale to Watkins. About the 1st of No-

vember, 1869, Currin seems to have left his wife. It also appears that he had a difficulty with his wife about October, 1867, which induced her to leave him and go to her brother, Jeremiah Cronin, in Chatham county, Georgia. Her husband followed her, and in order to induce her to return with him, agreed to convey, and did, on the 8th of October, 1867, convey to the said Jeremiah Cronin, ostensibly for the consideration of $1,500, but in reality without consideration, "all his right, title and interest in the lease of lot and premises" in question "together with all and singular the houses, outhouses, edifices, buildings, stables, yards, gardens, liberties, privileges, easements, commodities, emoluments, hereditaments, rights, members and appurtenances whatsoever thereunto belonging, or in anywise appertaining; and the reversion and reversions, remainder and remainders, rents, issues and profits, and all the estate, right, title and property, possession, claim and demand whatsoever, in law or in equity, of the said John Currin of, in or to the same, or any part thereof," &c., &c., &c. On the same day, and in pursuance of the agreement between the parties, Jeremiah Cronin sold and conveyed to Johannah Currin, the wife of said John Currin, "all of his right, title, and interest in the lease of lot and premises" in question, "said lease, this instrument recites, having been made originally to John Currin by Samuel Watkins for the term of five years, which term expires on the 10th day of February, 1869." The *habendum* of this conveyance is: "To have and to hold the said interest in said lease and improvements, and all and singular other the premises hereby granted unto the said Johannah Currin, her heirs and assigns forever, for her sole and separate use, free from the liabilities and marital rights of her present or any future husband, to be held in trust nevertheless by Jeremiah Cronin as the trustee of Johannah Currin," with power to dispose of the same by her request in writing to that effect.

Both of these conveyances were duly proved and registered in this county in October, 1867, but no notice of the same

was ever given to Sam'l Watkins, nor did he have actual knowledge thereof until the filing of the bill in this cause.

This bill is filed on the 21st of March, 1870, by "Jeremiah Cronin, trustee of Johannah Currin, a citizen of the state of Georgia," against Sam'l Watkins, setting out the original lease with some vagueness as to its terms, which is corrected by the production by the defendant of the original lease. The bill also stated the conveyance as above by John Currin to Jeremiah Cronin, the consideration being averred to be $1,500, an error of the draftsman corrected by the proof; also the conveyance by Cronin to his sister, Mrs. Currin, as above. The bill also charges that the said John Currin, since the expiration of the lease, had fraudulently combined with the defendant Watkins, who knew, or ought to have known of the disposition by Currin of his interest, the conveyance being of record, and sold said improvements to Watkins. That the said Johannah Currin has separated from her husband and is living with complainant, and is now desirous of disposing of her interest in the property under the power in the lease.

The prayer of the bill is that the sale of the improvements by John Currin to defendant Watkins be set aside, that suitable persons be appointed now to value the improvements, and the defendant be decreed to pay the sum assessed, with interest from the 10th of February, 1869.

The defendant demurred to this bill in the first instance. This demurrer seems to have been misplaced, and has not been furnished me. From the argument of the complainant's counsel upon it, which is filed with the papers, I find that the demurrer contained ten points, a number which, *prima facie*, would indicate a want of merit in any of them. One of the causes assigned, and the first in order as well as in merit, seems to have been that the remedy of the complainant was at law. The Chancellor overruled this demurrer, with leave to the defendant "to rely on the same matters in his answer," which, however, he has not done.

The failure to rely upon the matters of demurrer in the

answer would, on general principles, have worked no preju-
dice to the defendant under the well settled rules of chancery
practice. For, in the absence of any statutory provision on
the subject, the court would, by virtue of its inherent powers,
have the right to look to the matters of demurrer upon the
final hearing, although the demurrer had itself been over-
ruled. *Avery* v. *Holland*, 2 Tenn. 71, citing Lord Hard-
wicke's decision in *Dormer* v. *Fortescue*, 2 Atk. 284; and see
*Fourniquet* v. *Perkins*, 16 How. 82. But the supreme court
has, in some recent decisions not yet reported, and the pre-
cise purport of which I do not know, felt constrained to
modify the common law rule on the subject, by reason of
certain provisions of our statutes, and especially, I believe,
the provisions of the Code, § 3157, allowing parties to ap-
peal, in the discretion of the Chancellor, from his decision
overruling a demurrer. It may be that these decisions are
confined entirely to cases where an appeal has actually been
taken under this section, and the supreme court has sustained
the decree below overruling the demurrer. In that case the
court has decided in the case of *McNairy and others* v.
*Mayor, &c., of Nashville*, that the decision of the supreme
court upon the demurrer is final as to all matters necessarily
embraced in it, although not actually considered, under the
familiar principle that the estoppel of the judgment or decree
extends to all matters material to the decision of the cause
although not actually litigated. 3 W. & T. Lead. Cas. Eq.
184; 2 Story Eq. Jur., § 1523. Whether the decisions go fur-
ther, and restrict the Chancellor from reconsidering the
matters of an overruled demurrer, where there has been no
appeal, I am not advised. So, how far the provision of
§ 4321 of the Code, which declares the filing of an answer
to be a waiver of objection to the jurisdiction, might affect
the question under consideration, if the defendant fails to
rely upon matters of demurrer to the jurisdiction in his
answer, after permission given, is an open question. I am
inclined to construe such permission not literally but accord-
ing to its spirit, and to hold that, although worded so as to

allow the defendant to rely upon such matters "in his answer," the meaning was to permit him to rely upon them "at the hearing."

In this view, the first question for consideration is whether the case as made out is proper for equitable cognizance. The facts, it will be remembered, are that Watkins had no actual notice of the conveyance of the lease for the benefit of his tenant's wife, the same having been made in the state of Georgia, and to a trustee residing in that state. The wife returned and lived with her husband on the premises in question until the lease expired, and until some time after the sale of the buildings to Watkins, and this bill was not filed until the month of March, 1870. The lease upon its face shows that the right reserved to Currin to remove his improvements was "at the expiration of the lease," and, of course, the right of sale was limited to the same period. Whatever might be the legal rights of Currin or his assignees, either upon the covenant or for the use or conversion of his property, *at law*, it is clear that a court of conscience would listen to such a demand with little favor after the lapse of a reasonable time, as against a *bona fide* purchaser of such property, for value and without notice. The presumption is strong, if not conclusive, that Watkins' purchase and settlement with Currin was made with the knowledge of his wife, who was then living with him, and the complainant, who is a mere trustee, could stand in a court of equity in no better position than his *cestui que* trust. It was his duty, moreover, to have seen to the rights of his beneficiary at the termination of the lease, and, if he neglected to do so, to the prejudice of an innocent third person, his remedy in equity is gone, whatever it may be at law. This suit is in the trustee's name alone, and he has not made either his beneficiary or her husband a party, so as to settle equitable rights between them, or either of them, and the defendant. It is, in fact, a legal suit, brought in an equitable forum, to enforce purely legal rights. To have made it an equitable suit, the beneficiary was a necessary party.

Upon this ground alone, I think the bill should be dismissed with costs.

But I have come to the same conclusion upon the merits of this case, after a careful examination of the authorities upon one of the most abstruse branches of the law. Since the days of Lord Coke, and *Spencer's case*, 5 Coke, 16, the question as to what covenants run with the land has been a fruitful source of litigation. The difficulty has been complicated by a distinction, not always borne in mind, between covenants which run with the land, and covenants which run with the reversion. A covenant is said to run with the land, when either the liability to perform it, or the right to take advantage of it, passes to the assignee of the land. A covenant is said to run with the reversion, when either the liability to perform it, or the right to take advantage of it, passes to the assignee of the reversion. And the better opinion is that the assignee of the reversion could not bring an action at common law; *that at common law covenants run with the land but not with the reversion.* 1 Wm. Saunders, 240 *a*, note *o*. The statute of 32 Henry VIII, ch. 34, changed the common law, and gave a right of action to assignees, and against assignees of the reversion, but, as settled by *Spencer's case*, the statute only extends to covenants which touch and concern the things demised, and not to collateral covenants. It was also settled by the same case, that if assignees be not expressly mentioned, and the covenant concerns a thing which was not *in esse* at the time of the demise made, but to be newly built after, it will bind the covenantor, his executors or administrators, *but not the assignee*. This ruling seems to have been followed both in England and in this country. 1 Smith's Lead. Cas., pp. 123 and 127, side pages. So, also, the correlative proposition has been held, that, if the lessor bind himself, without naming his assigns, to pay the lessee the cash valuation of improvements not *in esse* at the time of the demise, but to be put upon the premises afterwards by the lessee, such a covenant will not bind the assignee of the reversion. 1 Smith's Lead. Cas. 177, and cases cited.

And this last ruling was expressly followed by our supreme court in *Brown* v. *Dickerson*, 2 Hum. 126.

The authorities are not, however, altogether clear upon the point whether, although the *obligation* of the covenant will not bind the assignee of the land or the reversion, as the case may be, where the assigns are not named and the covenant extends to a thing not *in esse*, the *benefit* of the covenant will not pass to the assignee although he be not named. But, upon principle, there would seem to be no distinction between the burden and the benefit in the application of the rule, the mutuality incident to the contract requiring that the one should not be separated from the other ; and that a party who is not bound to perform an agreement should not be entitled to exact performance. Accordingly, it was held in *Tallman* v. *Coffin*, 4 Comst. 134, that the omission of the word assigns from a covenant by the lessor to pay the tenant for all improvements which he might place on the premises during the continuance of the term, and leave there at its termination, restricted the obligation to the original parties, and precluded the tenant from enforcing it against the assignee of the reversion. And, on the other hand, in *Thompson* v. *Rose*, 8 Cow. 262, it was held, in like manner, that a covenant by the lessor to pay the lessee the value of any buildings which he might think fit to erect on the demised premises, did not pass with an assignment of the lease, because it did not contain the word assigns, and was made solely with the lessee.

The lease in this case does not use the word assigns in any part of it. The benefit of the covenant of the lessor therefore did not pass with the assignment of the lease to the complainant, so as to enable him to sue in his own name. The assignment of the lease did, however, pass the interest of the lessee, and gave the assignee, on well established principles, the right to the use of all the legal remedies of the assignor, and to sue in his name at law, and, perhaps, to come into this court for the enforcement of the equitable interests thus acquired. But what is thus assigned is only

the right of action created by the covenant, and such an assignment, it is well settled in this state, is not embraced by the registry law.   Code, § 2004 ; *Marshall* v. *Fields*, cited in *Allen* v. *Bain*, 2 Head, 118 ; *Mayer* v. *Pulliam*, 2 Head, 346 ; *Clodfelter* v. *Cox*, 1 Sneed, 330 ; *Kelly* v. *Thompson*, 2 Heisk. 278, 281.   And it is equally well settled that the rights of an assignee under such an assignment are not complete until actual notice to the debtor.   *Clodfelter* v. *Cox*, 1 Sneed, 330.   And a previous settlement with the assignor will be good.

The result is that the registration of the assignment of the lease was not notice to the defendant of the assignment of the right of action against him, and if he settled the obligation with the assignor before notice, the assignee has no right of action against him either at law or in equity.

The bill must be dismissed with costs.